ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| FlightSafety International, Inc. | ) | ASBCA No. 62659 |
| | ) | |
| Under Contract No. FA8621-15-D-6257 | ) | |

APPEARANCES FOR THE APPELLANT:      Gale R. Monahan Esq.
                                                                    Dentons US LLP
                                                                    Dallas, TX

                                                                    Keric B. O. Chin, Esq.
                                                                    Dentons US LLP
                                                                    Denver, CO

APPEARANCES FOR THE GOVERNMENT:   Jeffrey P. Hildebrant, Esq.
                                                                    Deputy Chief Trial Attorney
                                                                    Lt Col Christopher M. Wu, USAF
                                                                    David K. Stark, Esq.
                                                                    Joel B. Lofgren, Esq.
                                                                    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE DANIEL S. HERZFELD

FlightSafety International, Inc. (FlightSafety) appeals the Department of the Air Force's (Air Force) contracting officer's final decision invalidating FlightSafety's proprietary markings on its commercial technical data—21 drawings. The parties cross-moved for judgment on the record and requested that the Board issue a decision on the merits based on Board Rule 11.[1] Flight Safety contends that the contract prevents the Air Force from challenging the validity of FlightSafety's commercial restrictive markings

_____

[1] The parties originally cross-moved for partial summary judgment relating to Counts I and II of the three-count complaint. Subsequent to completion of the briefing, the parties jointly requested that we convert their cross-motions for partial summary judgment to cross-motions for judgment on the record under Board Rule 11, stating neither discovery nor a hearing was necessary. In the same request, the parties informed the Board that the parties had settled Count III of the complaint, which related to a dispute regarding whether 18 technical data drawings should be characterized as data "necessary for operation, maintenance, installation, and training." We granted the request to proceed under Rule 11 and this decision resolves Counts I and II of the complaint and, based on the parties' settlement of Count III, formally dismisses Count III.

because the Air Force provides no evidence that the data was not developed exclusively at private expense (Count I). FlightSafety also contends that, even if the Air Force can challenge FlightSafety's proprietary restrictions, the commercial restrictive markings were proper (Count II). For the reasons discussed below, (1) we deny FlightSafety's appeal on Count I because contractual and statutory provisions permit the Air Force to challenge the proprietary restrictions of the type of commercial technical data at issue here, despite having been exclusively developed at private expense; (2) we deny FlightSafety's appeal on Count II because we find that FlightSafety's commercial restrictive markings are not substantially justified, contradicting the Air Force's contractual license rights in the technical data; and (3) we dismiss Count III per the settlement agreement entered by the parties.

FINDINGS OF FACT

I.    *The Contract, Task Order, and Subcontract Purchase Orders*

On August 11, 2015, the Air Force awarded to CymSTAR, LLC, Contract No. FA8621-15-D-6257 (Contract) and 24 additional contracts to other contractors, which were multiple award, indefinite delivery/indefinite quantity contracts to support the Training Systems Acquisition III program, including the development, acquisition, and sustainment efforts needed to meet Air Force simulation and training requirements (R4, tab 14 at 1 (Contract)); Contracts for Aug. 11, 2015, U.S. Dep't of Defense.[2]

On September 11, 2017, the Air Force awarded CymSTAR Task Order No. FA8621-17-D-6255 (Task Order) under the Contract to provide comprehensive operations, maintenance, and sustainment services for the C-5 Aircrew Training System (R4, tab 3 at 2 (Performance Work Statement); tab 4 (Task Order Award excerpts)).

On April 3, 2018 and October 3, 2018, CymSTAR awarded subcontracts by issuing purchase orders (Purchase Orders) to FlightSafety for the supply and installation of a visual system replacement for the C-5 Aircrew Training System under the Task Order, including image generators, display management systems, and projectors for the C-5 weapon systems trainers at several Air Force installations in the United States (app. supp. R4, tabs 2, 3, 4). The Purchase Orders incorporated FlightSafety's proposal, which stated that "[t]his is a commercial offering" (app. supp. R4, tab 2 at 5; tab 4 at 7-17).[3]

_____

[2] https://www.defense.gov/Newsroom/Contracts/Contract/Article/613351/ (visited on Nov. 28, 2022).

[3] CymSTAR's Purchase Orders both included its General Terms and Conditions, which state: "Documents designated by [CymSTAR] in the body of the Purchase Order, including [FlightSafety's] quotation or proposal and [CymSTAR's] statements of work, specifications, drawings, and data supplemental terms and conditions, if any, are incorporated by reference the same as if set out in full therein" (app. supp. R4,

The Contract and Task Order incorporated by reference the following four relevant clauses: (1) Defense Federal Acquisition Regulation Supplement (DFARS) 252.227-7015 TECHNICAL DATA – COMMERCIAL ITEMS (FEB 2014), (Commercial Technical Data clause); (2) DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA – NONCOMMERCIAL ITEMS (FEB 2014) (Noncommercial Technical Data clause); (3) DFARS 252.227-7025, LIMITATIONS ON THE USE OR DISCLOSURE OF GOVERNMENT-FURNISHED INFORMATION MARKED WITH RESTRICTIVE LEGENDS (MAY 2013); and (4) DFARS 252.227-7037, VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA (JUNE 2013) (Validation clause) (R4, tab 4 at 41 (Task Order); tab 14 at 90 (Contract)).

As required by the Commercial Technical Data and Validation clauses, CymSTAR flowed those clauses down to its subcontractor, FlightSafety, in the Purchase Orders (app. supp. R4, tab 3 at 10; tab 4 at 19); DFARS 252.227-7015(e)(2) ("Whenever any technical data related to commercial items developed in any part at private expense will be obtained from a subcontractor or supplier for delivery to the Government under this contract, the Contractor shall use this same clause in the subcontract or other contractual instrument, including subcontracts and other contractual instruments for commercial items, and require its subcontractors or suppliers to do so, without alteration, except to identify the parties."); DFARS 252.227-7037(*l*) ("The Contractor or subcontractor agrees to insert this clause in contractual instruments, including subcontracts and other contractual instruments for commercial items, with its subcontractors or suppliers at any tier requiring the delivery of technical data.")).[4]

---

tab 3 at 6; tab 4 at 4). Both Purchase Orders listed Flight Safety's "Vendor Quote: FV118P4887 REV A" and, thus, it was incorporated by reference (app. supp. R4, tab 3 at 1; tab 4 at 1). One of the Purchase Orders also included FlightSafety's proposal as an attachment (app. supp. R4, tab 4 at 7-17).

[4] CymSTAR did not flow down the Noncommercial Technical Data clause to FlightSafety (app. supp. R4, tab 3 at 10; tab 4 at 19). CymSTAR attempted to flow down the Noncommercial Technical Data clause (app. supp. R4, tab 1 at 26). FlightSafety appears to have negotiated to have that clause removed based on providing only commercial technical data developed exclusively at private expense, which would negate the need to flow down the Noncommercial Technical Data clause. DFARS 252.227-7013(k)(2) ("Whenever any technical data for noncommercial items, or for commercial items developed in any part at Government expense, is to be obtained from a subcontractor or supplier for delivery to the Government under this contract, the Contractor shall use this same clause in the subcontract or other contractual instrument, including subcontracts or other contractual instruments for commercial items, and require its subcontractors or suppliers to do so, without alteration, except to identify the parties.").

3

In the Purchase Orders, FlightSafety identified its drawings as proprietary and granted only "limited rights" in that data on the basis that FlightSafety "exclusively developed @ its own private expense. DFARS 252.227-7015(b)(2) Technical Data – Commercial Items" (app. supp. R4, tab 4 at 16; tab 2 at 11).  The Commercial Technical Data clause, DFARS 252.227-7015(b)(2), generally states, "Except as provided in paragraph (b)(1) of this clause, the Government may use, modify, reproduce, release, perform, display, or disclose technical data within the Government only." *See also* 10 U.S.C. § 2320(a)(2)(B) (2020) (statutory provision stating, with exceptions, "in the case of an item or process that is developed by a contractor or subcontractor exclusively at private expense, the contractor or subcontractor may restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the government or permit the use of the technical data by such persons"), *redesignated*, 10 U.S.C. § 3771(b)(2) (2021).[5]  The Commercial Technical Data clause treats this as the default license rights that the government receives, but acknowledges specific types of data for which the government receives greater license rights under paragraph (b)(1) of the clause (discussed below).  Under paragraph (b)(2)'s more restrictive license, the government may neither "[u]se the technical data to manufacture additional quantities of the commercial items" nor "[r]elease, perform, display, disclose, or authorize use of the technical data outside the Government without the Contractor's written permission unless a release, disclosure, or permitted use is necessary for emergency repair or overhaul of the commercial items furnished under this contract, or for performance of work by covered Government support contractors."  DFARS 252.227-7015(b)(2)(i) & (ii).

Any release or disclosure of commercial data to support contractors under 7015(b)(2)(ii) requires notice to the prime contractor (here, CymSTAR).  DFARS 252.227-7015(b)(3)(ii).  The Commercial Technical Data clause also requires support contractors to enter a non-disclosure agreement directly with the prime contractor "or the party asserting restrictions as identified in a restrictive legend" (here, FlightSafety) that "shall address the restrictions on the covered Government support contractor's use of the data as set forth in the clause at 252.227-7025, Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends."  DFARS 252.227-7015(b)(3)(iii)-(iv).

---

[5] On January 1, 2021, Congress reorganized the Defense Department's acquisition provisions of Title 10 of the United States Code and renumbered and redesignated sections 2320-2321 to sections 3771-3775 and 3781-3786, which we discuss throughout this decision.  William M. (Mac) Thornberry National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. No. 116-283, § 1833, 134 Stat. 3388, 4225-34 (2021).  The statute did not substantively "alter" the effect of any code provision or regulatory and judicial interpretation of the provisions; it also included a savings provision to assure that any regulations continued in effect under the redesignated provisions.  NDAA §§ 1884, 1885, 134 Stat. at 4294.

4

While paragraph (b)(2) gives the government a more restrictive license right, paragraph (b)(1) gives the government an "unrestricted rights" license in certain types of data. In particular, paragraph (b)(1) includes five situations in which the contractor grants the Government "unrestricted rights to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so . . . ." DFARS 252.227-7015(b)(1). As pertinent here, one of the five exceptions grants this unrestricted rights license where the technical data "[a]re necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data)"—we refer to "operation, maintenance, installation, or training" data as "OMIT" data. DFARS 252.227-7015(b)(1)(iv); *see also* 10 U.S.C. § 2320(a)(2)(C)(iii) (2020) (statutory OMIT exception), *redesignated*, 10 U.S.C. § 3771(b)(3)(C) (2021).

II. *FlightSafety Marks Its Technical Data Drawings with Proprietary Legends, But the Air Force Challenges the Markings*

On June 28, 2018, CymSTAR delivered FlightSafety's drawings to the Air Force as part of the technical data package for the C-5 aircrew training system at Lackland Air Force Base (R4, tab 2 at 77-78; tab 6 at 1). The delivered drawings included the 21 drawings at issue in this appeal: (1) S91Y1038 Spacer, Projector Mount, JVC-2100 (R4, tab 10w); (2) S85S1009 Guide, Lower Projector (R4, tab 10v); (3) S85S1002 Guide, Upper Projector (R4, tab 10u); (4) S76Y1202 Plate, VS-22300 Portrait Mount (R4, tab 10t); (5) S76Y1155 Plate, Projector Mount Interface (R4, tab 10s); (6) S76Y1062 Plate, Accessory Mount (R4, tab 10r); (7) S69Y1156 Mount, Projector, Cantilevered, VS-2300 (R4, tab 10q); (8) S69Y1148 Mount, Roll Adjustment (R4, tab 10p); (9) S69Y1147 Mount, Azimuth and Elevation Adjustment (R4, tab 10o); (10) S69Y1145 Mount, Projector, Cantilevered, VS-2300 (R4, tab 10n); (11) S42Y1009 Gasket, Projector (R4, tab 10m); (12) S42Y1008 Gasket, Projector (R4, tab 10*l*); (13) S23Y1070 Support, Knob, Projector Assy (R4, tab 10k); (14) S21Y1110 Bracket (R4, tab 10j); (15) S11G1654 Projector and Mount Installation (R4, tab 10i); (16) S06G1300 Projector Assy, JVC (R4, tab 10y); (17) H14G5291 Cable Assy (R4, tab 10e); (18) H14G5290 Cable Assy (R4, tab 10d); (19) H14G5239 Cable (R4, tab 10c); (20) H06G4223 ESD Panel (R4, tab 10b); and (21) D54L1014 Mount, Config Table (R4, tab 10x) (R4, tab 9 at 9). This information qualifies as technical data, which the Contract defines as "recorded information, regardless of the form or method of recording, of a scientific or technical nature (including computer software documentation)." DFARS 252.227-7015(a)(5).

The Air Force offers no evidence to dispute that the 21 drawings were developed exclusively at private expense and admits that "for the limited purposes of this appeal" the drawings constitute commercial technical data (answer ¶¶ 2, 5).

On July 26, 2018, the Air Force informed CymSTAR that the Air Force disapproved FlightSafety's drawings because, among other reasons, "Non conformal proprietary markings present" (R4, tab 6 at 2-5). The Air Force directed the removal of the markings

(*id*.).  FlightSafety had included two different markings on its documents.  A short marking appeared in the lower left-hand corner of some documents, which read:

FlightSafety International Proprietary
Rights Reserved

(R4, tabs 10b, 10c, 10d, 10e, 10j, 10k, 10r, 10s, 10u, 10v, 10w).  Other documents included the word "Proprietary" in the top left and bottom right margins with a long marking in the top left corner of the drawings (varying only with the date of the copyright):

PROPRIETARY MATERIAL
Copyright © 2014. All rights reserved.
FlightSafety International Inc.
This document, including the information contained
herein, is confidential and/or proprietary to FlightSafety
International Inc. It shall not be reproduced, distributed, or
disclosed to others, except as expressly authorized in
writing.

(R4, tabs 10i, 10*l*, 10m, 10n, 10o, 10p, 10q, 10t, 10x, 10y).  Each of the 21 documents included either the long or short marking but none of the documents had both a short and long marking.

On October 25, 2019, FlightSafety responded to the Air Force (through its prime contractor—CymSTAR) (R4, tab 7 (letter from FlightSafety to CymSTAR); R4, tab 8 (Air Force acknowledging receipt of FlightSafety's letter)).  FlightSafety declined to remove its markings but agreed the Air Force "may disclose our documents" in adherence "to the requirements of the DFARS, such as but not limited to, notice and [non-disclosure agreement] requirements outlined in 252.227-7015(b)(3)(ii) and (iii)" (R4, tab 7 at 1).  FlightSafety referenced a conversation with the Air Force contracting officer, who stated the Air Force "would take all rights they were entitled to have" (*id*. at 1-2).  FlightSafety asserted, "This is simply not authorized by Policy.  The [Air Force] can take what it needs and no more" (*id*.at 2).  In an attempt to resolve the Air Force's concerns, FlightSafety proposed an alternative proprietary marking for its drawings:

FlightSafety Technical Data provided to the US. Government
with unrestricted rights only pursuant to the requirements in
CymSTAR Purchase Order PO003174-3 under US Government
Contract #FA8621-15-D-6257, DO: FA8621-17-F-6255, the
procedures specified in DFARS 252.227-7015
and limited by DFARS 227.7103-1.

(R4, tab 7 at 2).

6

On February 24, 2020, the Air Force responded directly to FlightSafety and challenged FlightSafety's protective legends (including FlightSafety's newly proposed marking from its October 25, 2019 letter) (R4, tab 8). The Air Force invoked the Validation clause of the Contract (which CymSTAR flowed down to FlightSafety in the Purchase Order), DFARS 252.227-7037 (R4, tab 14 at 90 (Contract incorporation of Validation clause by reference); tab 8 at 2; tab 4 at 41 (Task Order incorporation of Validation clause by reference); app. supp. R4, tab 3 at 10; tab 4 at 19 (Purchase Order incorporation of Validation clause by reference)). The Validation clause states that the contracting officer "will presume that a Contractor's asserted use or release restrictions are justified on the basis that the item, component, or process was developed exclusively at private expense" for "commercially available off-the-shelf items (defined at 41 U.S.C. 104) in all cases and for all other commercial items except" for "major systems or subsystems or components thereof . . . ." DFARS 252.227-7037(b)(1), (2). The Validation clause also states, "The Contracting Officer shall not challenge such assertions unless the Contracting Officer has information that demonstrates that the item, component, or process was not developed exclusively at private expense." DFARS 252.227-7037(b)(1).

The Validation clause further states that, "if the Contracting Officer determines that a challenge to the restrictive marking is warranted, the Contracting Officer shall send a written challenge notice to the Contractor or subcontractor asserting the restrictive markings" stating the "specific grounds for challenging the asserted restriction" and requiring the contractor or subcontractor to respond within 60 days "justifying and providing sufficient evidence as to the current validity of the asserted restriction." DFARS 252.227-7037(e)(1).

Consistent with the Validation clause, the Air Force's contracting officer provided a rationale for its challenge. The Air Force asserted that FlightSafety's 21 drawings of technical data constituted OMIT data that gave the Air Force "unrestricted rights" in the technical data under the OMIT exception to the Commercial Technical Data clause, DFARS 252.227-7015(b)(1)(iv) (R4, tab 8 at 1). In particular, as to the proprietary markings affixed to the 21 drawings, the contracting officer stated:

> [R]easonable grounds exist to question the current validity of the asserted restriction, and the continued adherence by the United States to the asserted restriction would make it impracticable to procure the item to which the technical data pertain competitively at a later time. Because the data deliverables are required for OMIT —a determination FlightSafety has not questioned—any markings thereon may not restrict the Government's right to use, modify, reproduce, release, or disclose the data. DFARS 252.227-7015(b)(1)(iv).

(*Id.*) As to FlightSafety's alternative proposed marking in its October letter, the Air Force asserted that the proposed markings also improperly restricted the Air Force's rights in the OMIT data under the Commercial Technical Data clause and, because the OMIT data exception applied under DFARS 252.227-7015(b)(1)(iv), the Air Force was not required to obtain a non-disclosure agreement to release this commercial data outside the government under the procedures of DFARS 252.227-7015(b)(2) (R4, tab 8 at 1-2).

On April 22, 2020, FlightSafety responded to the Air Force's challenge and certified its response as a claim requesting a contracting officer's final decision (R4, tab 9). FlightSafety offered four arguments for its position (*id.* at 5-7). First, FlightSafety asserted that the Air Force breached the Validation clause by challenging FlightSafety's restrictive markings because the Air Force had made no showing that the drawings were not created exclusively at private expense (*id.* at 5). According to FlightSafety, the Validation clause prohibits a challenge by the contracting officer "unless the Contracting Officer has information that demonstrates that item, component, or process was not developed exclusively at private expense" (*id.* (quoting DFARS 252.227-7037(b)(1) but citing it as (b)(2)). Second, contradicting the Air Force's challenge letter, FlightSafety asserted that the Commercial Technical Data clause did not give the government the right to use that data "for the purpose of competing the procurement of the underlying items at a later time" (*id.* at 5-6 (citing DFARS 252.227-7015)). Third, FlightSafety asserted that the Air Force could only obtain unrestricted rights in certain technical data, such as OMIT data but, contrary to the Air Force's assertion in the challenge letter, only three of the 21 drawings were OMIT data (*id.* at 6).[6] FlightSafety asserted that the Air Force had breached the Commercial Technical Data clause by asserting that all drawings were OMIT data (*id.*). Fourth, FlightSafety asserted that the proprietary markings on its data complied with the Commercial Technical Data clause, which releases the government from liability when disclosing unmarked data, and the proprietary markings did not foreclose the Air Force's use of the data for OMIT purposes (*id.* at 7 (citing DFARS 252.227-7015(d)).[7]

---

[6] FlightSafety acknowledged the following three drawings constituted OMIT data: (1) H06G4223, ESD Panel (R4, tab 10b); (2) S06G1300, Projector Assy, JVC (R4, tab 10y); and (3) S11G1654, Projector and Mount Installation (R4, tab 10i). (R4, Tab 9 at 6 n.5). Based on the parties' settlement of Count III of the complaint, FlightSafety has granted the Air Force unrestricted rights to the remaining 18 drawings as if they were OMIT data under Commercial Technical Data clause, DFARS 252.227-7015(b)(1).

[7] DFARS 252.227-7015(d) states:
The Contractor agrees that the Government, and other persons to whom the Government may have released or disclosed technical data delivered or otherwise furnished under this contract, shall have no liability for any release or disclosure of technical data that are not marked to indicate that such data are licensed data subject to use, modification, reproduction, release, performance, display, or disclosure restrictions.

On June 18, 2020, the Air Force's contracting officer denied FlightSafety's claim, found the markings unreasonable, and responded to each of the four arguments raised by FlightSafety (R4, tab 1). First, the Air Force asserted that the Validation clause did not prohibit the government from challenging OMIT data, because the Commercial Technical Data clause required FlightSafety to provide an unrestricted rights license in the OMIT technical data (*id*. at 2). The Air Force asserted that its "challenge relates to the *type* of information and not the source of funding," rendering inapplicable the Validation clause's prohibition on the government challenging commercial technical data exclusively developed at private expense (*id*.at 2 (emphasis in original)). Second, the Air Force asserted that the Commercial Technical Data clause unequivocally gave the government unrestricted rights in the OMIT data and, thus, permitted the government to use the data for any purpose including "future source selections" (*id*.at 2-3). Third, the Air Force highlighted the word "necessary" in the Commercial Technical Data provision giving the government unrestricted rights in technical data "necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data)" (*id*. at 3 (quoting DFARS 252.227-7015(b)(1)(iv)). The Air Force argued that "the user of the data . . . is best positioned to know what is necessary, and the regulation [*sic*] permits the Government, not [FlightSafety], to define what is or is not necessary here for OMIT purposes" (*id*.). Fourth, the Air Force asserted that all 21 drawings constituted OMIT data and found FlightSafety's markings "unjustified" because "OMIT data may not be delivered with markings that restrict the Government's right to use, etc., the data" (*id*.). The Air Force conceded FlightSafety correctly stated that the Commercial Technical Data clause "does not articulate a required form for commercial data markings," but asserted that the Commercial Technical Data clause "does require that the markings be reasonable, neither contradicting nor otherwise limiting the Government's rights in the data" (*id*.). The Air Force agreed to be bound by FlightSafety's restrictive markings for 90 days to permit appeal to the Board or notice of intent to file suit at the Court of Federal Claims (*id*. at 4).

On August 28, 2020 (within 90 days of the contracting officer's final decision), FlightSafety timely filed a notice of appeal with this Board, which docketed the appeal on September 2, 2020.

DECISION

I.     *Jurisdiction*

By statute, a subcontractor may appeal a contracting officer's decision invalidating its restrictive markings: "If a claim pertaining to the validity of the asserted restriction is submitted in writing to a contracting officer by a contractor or subcontractor at any tier, such claim shall be considered a claim within the meaning of chapter 71 of title 41." 10 U.S.C. § 2321(h) (2020), *redesignated*, 10 U.S.C. § 3785(b) (2021); DFARS 252.227-7037(e)(3) (June 2013) ("The Contractor's or subcontractor's written response shall be considered a claim within the meaning of the 41 U.S.C. 7101, Contract Disputes and shall

9

be certified in the form prescribed at 33.207 of the Federal Acquisition Regulation, regardless of dollar amount."); *see also* DFARS 252.227-7037(h)(1) (discussing possibilities "[i]f the Contractor or subcontractor appeals or files suit"); *Cubic Defense Applications, Inc.*, ASBCA No. 58519, 18-1 BCA ¶ 37,049 at 180,362 ("Congress specified, if a response is submitted to a CO by either a contractor or subcontractor, it shall be considered a 'claim' within the meaning of the Contract Disputes Act (CDA)."). Prior to enactment of this statute, a subcontractor could not appeal a restrictive markings claim to the Board under the CDA without prime contractor sponsorship. *Gen. Connectors Corp.*, ASBCA No. 32298, 87-2 BCA ¶ 19,751 at 99,943 ("However, after the Government correctly pointed out the inapplicability to the solicitation for the above captioned contract of 10 U.S.C. § 2321, which was made applicable only to solicitations issued on or after 19 October 1985, appellant admitted that the statute 'by its terms [is] not expressly applicable to this dispute.'").[8] Thus, this Board has jurisdiction to hear a subcontractor's appeal of its claim to validate its restrictive markings on its technical data without prime contractor sponsorship.

## II.    *Standard of Review*

Board Rule 11 permits parties to waive a hearing and submit their appeal on the record. ASBCA Rule 11(a). "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13).

FlightSafety, as the proponent of the claim, bears the burden of proof because an appeal of a restrictive marking constitutes a contractor (or here, subcontractor) claim and not a government claim. *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,371. Notably, the parties here followed the process set forth in statute and contract for contractors or

---

[8] We have previously concluded that the Board lacked jurisdiction to hear a subcontractor's appeal of an agency's assertion of broader license rights in a subcontractor's computer software. *Binghamton Simulator Co.*, ASBCA No. 59117, 14-1 BCA ¶ 35,715. Unlike computer software, however, Congress has waived sovereign immunity to allow subcontractors to challenge an agency's attempt to invalidate restrictive markings to technical data (which by statutory definition excludes computer software). *See generally* 10 U.S.C. § 2321(2020) (applying to "technical data" throughout section), *redesignated*, 10 U.S.C. §§ 3781-3786 (2021); 10 U.S.C. § 2302(4) (2020) (stating that "'technical data' . . . . does not include computer software"), *redesignated*, 10 U.S.C. § 3013 (2021); *see also* 41 U.S.C. § 4703(f) (permitting subcontractor suits where civilian agencies invalidate technical data restrictions).

subcontractors to challenge an agency's decision regarding restrictive markings and, thus, the contracting officer's decision regarding restrictive markings results in a contractor claim, not a government claim. *Alenia N. Am., Inc.,* ASBCA No. 57935 *et al.*, 13-1 BCA ¶ 35,296 at 173,271 ("Both Section 2321(h) and DFARS 252.227-7037(e)(3) address contractor claims; neither precludes the government from filing its own claim, as allowed by the CDA.").

III.     *The Air Force May Challenge FlightSafety's Restrictive Markings*

The Validation clause permits the Air Force to challenge the validity of FlightSafety's restrictive legends even if the agency does not challenge whether FlightSafety developed the technical data exclusively at private expense.  Moreover, the Validation clause derives from statute, which confirms the plain meaning of the contract clause.

A.  *The Plain Meaning of the Contract Permits the Air Force to Challenge the Validity of Restrictive Legends Regardless of Whether a Commercial Item's Technical Data Were Developed Exclusively at Private Expense*

"Contract interpretation begins with the language of the agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  In particular, we begin by looking at the plain language of the Contract, which controls. *Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1326 (Fed. Cir. 2020); *Hercules, Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls." (internal citation omitted)).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *NVT*, 370 F.3d at 1159.

The parties dispute the meaning of one paragraph of the Validation clause, but looking at the plain meaning of the entire clause demonstrates that the Air Force can challenge FlightSafety's restrictive markings regardless of whether FlightSafety developed the commercial technical data exclusively at private expense.

The Validation clause includes the following paragraph that FlightSafety asserts is dispositive:

> (b)  *Presumption regarding development exclusively at private expense–*
>
> (1)  *Commercial items.*  For commercially available off-the-shelf items (defined at 41 U.S.C. 104) in all cases, and for all other commercial items except as provided in paragraph (b)(2) of this clause, the Contracting Officer will presume that a

11

Contractor's ***asserted use or release restrictions*** are justified on the basis that the item, component, or process was developed exclusively at private expense.  The Contracting Officer shall not challenge ***such assertions*** unless the Contracting Officer has information that demonstrates that the item, component, or process was not developed exclusively at private expense.

DFARS 252.227-7037(b)(1) (bolded emphasis added).

The Air Force does not dispute that the 21 drawings of technical data were developed exclusively at private expense (answer ¶¶ 2, 5).  The Air Force, however, argues that this contract provision only relates to a contracting officer's challenge to the source of funding and does not inhibit its challenge to restrictions placed on the type or purpose of data, such as for OMIT data (gov't mot. at 19-20).  FlightSafety disagrees and argues that "such assertions" in the second sentence relates back to the "asserted use or release restrictions" and not the source of funding (app. resp. at 17-18).  When looking at this paragraph standing alone, FlightSafety's argument presents some appeal.

However, we cannot derive the plain language meaning by simply looking at isolated sentences or paragraphs, but must construe the language in the context of the entire contract clause (and contract) as a whole.  *Boeing*, 983 F.3d at 1327 ("[W]hen interpreting statutes or regulations, '[t]he plain meaning that we seek to discern is the plain meaning of the whole statute [or regulation], not of isolated sentences.'" (quoting *Beecham v. United States*, 511 U.S. 368, 372 (1994) (citations omitted)); *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) ("Generally, this court also construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

Taken as a whole, the Validation clause demonstrates that the government may challenge restrictions even when it does not challenge whether the technical data was developed exclusively at private expense.  For example, the Validation clause elsewhere states that a contracting officer's challenge shall "[s]tate the specific grounds for challenging the asserted restriction," DFARS 252.227-7037(e)(1)(i), which would make no sense if the contracting officer could only challenge the funding source.  Additionally, the Validation clause permits the contracting officer to challenge certain types of data outside the statute of limitations including technical data made "publicly available," "furnished to the United States without restrictions," or "otherwise made available without restriction." DFARS 252.227-7037(i)(1)-(3).  FlightSafety's interpretation renders these clauses superfluous because a contracting officer would not be able to challenge restrictions on these types of privately-developed data.  Even in the commercial marketplace, technical data developed at private expense loses proprietary protection when publicly disclosed. *Secure Servs. Tech., Inc. v. Time & Space Processing, Inc.*, 722 F. Supp. 1354, 1360 (E.D. Va. 1989) (noting that "public disclosure of information through . . . carelessness can

preclude protection" (quoting the Uniform Trade Secrets Act § 1 comment, 14 U.L.A. 369, 373 (Supp. 1989)); *CANVS Corp.*, ASBCA Nos. 57784, 57987, 18-1 BCA ¶ 37,156 at 180,892 ("Information in the public domain or that is common knowledge in an industry cannot be considered proprietary or a trade secret."), *aff'd*, 789 F. App'x 880 (Fed. Cir. 2020).  Thus, taken as a whole, the Contract's Validation clause permits the Air Force to challenge FlightSafety's asserted restrictions on its commercial technical data.

      B.  *The Plain Meaning of the Statute Supports Our Interpretation of the Contract's Validation Clause*

Because Congress required promulgation of the Validation contract provision in the DFARS, both parties also look to the relevant statute (10 U.S.C. § 2321) to ascertain Congressional intent and purpose (gov't mot. at 18-21; gov't reply at 12-15; app. resp. at 15-22; app. reply at 11-12).  Here, the plain meaning of the statute supports our conclusion that the government can challenge a contractor's use and release restrictions even if a commercial item's technical data was developed exclusively at private expense.

"For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001).  The Contract's Validation clause derives directly from 10 U.S.C. § 2321 and the contractual presumption regarding privately developed commercial items technical data specifically derives from 10 U.S.C. § 2321(f) (2020), *redesignated*, 10 U.S.C. § 3784 (2021).  60 Fed. Reg. 33,464, 33,470 (June 28, 1995).

Like the DFARS contract clause, the statute includes similar language regarding the presumption of development at private expense and how it affects the agency's ability to challenge technical data:

> (f)  PRESUMPTION OF DEVELOPMENT EXCLUSIVELY AT PRIVATE EXPENSE.—In the case of a challenge to a use or release restriction that is asserted with respect to technical data of a contractor or subcontractor under a contract for commercial products, the contracting officer shall presume that the contractor or subcontractor has justified the restriction on the basis that the item was developed exclusively at private expense, whether or not the contractor or subcontractor submits a justification in response to the notice provided pursuant to subsection (d)(3).  In such a case, the challenge to the use or release restriction may be sustained only if information provided by the Department of Defense demonstrates that the commercial product[] was not developed exclusively at private expense.

13

10 U.S.C. § 2321(f) (2020).[9]  Like its argument regarding the Contract's Validation clause, FlightSafety similarly argues that the statute allows a contracting officer's challenge to use or release restrictions "only if" the agency can demonstrate that the commercial item was not developed exclusively at private expense (app. resp. at 17).  Like the analogous portion of the Validation Clause, taken in isolation, this clause offers some support to FlightSafety's argument, but it suffers from the same problem of running counter to the remainder of the statutory scheme.

"Whether the text of a statute is plain or ambiguous 'is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.'"  *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 686 F.3d 1348, 1354 (Fed. Cir. 2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  Indeed, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Here, the statute, like its DFARS contractual progeny, indicates that the presumption is limited to challenges to the funding source and does not bar other challenges.  For example, in language adopted verbatim by the DFARS clause, the statute requires a validation challenge "to state the specific grounds for challenging the asserted restriction . . . ."  10 U.S.C. § 2321(d)(3)(A) (2020), *redesignated*, 10 U.S.C. § 3782(c)(1) (2021).  Again, if funding was the only basis for restrictions, then there would be no need to express "specific grounds."  Also, as adopted by the DFARS provision verbatim, the statute permits challenges by the agency outside the statute of limitations for technical data made "publicly available," "furnished to the United States without restrictions," or "otherwise made available without restriction."  10 U.S.C. § 2321(d)(2)(A)(i)-(iii) (2020), *redesignated*, 10 U.S.C. § 3782(b)(1)(A)-(C) (2021).  As with the Contract's Validation clause, FlightSafety's interpretation of the statute renders these clauses superfluous because

_____

[9] In 2018, Congress amended this section to replace "commercial item" with "commercial product" in an effort to more precisely define commercial items as either commercial products or commercial services in the United States Code.  John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 836(c)(7), 132 Stat. 1636, 1866 (Aug. 13, 2018).  This explains the discrepancy between the use of "commercial items" in the Contract's Validation clause (from 2013) and the use of "commercial products" in the 2020 version of the United States Code.  *See* DFARS 252.227-7037(b)(1) (June 2013).  In 2021, Congress redesignated this code section but without the correction, so the redesignated section reads as the old provision did and refers to "items," not "products."  *See* 10 U.S.C. § 3784 (2021).

a contracting officer would not be able to challenge restrictions of these types of privately-developed data.

Moreover, the use of the term developed "exclusively at private expense" in § 2321(f) directly connects this section to 10 U.S.C. § 2320(a)(2)(B), which permits a contractor or subcontractor to restrict technical data developed "exclusively at private expense" from release outside the government with some important exceptions:

> (B) DEVELOPMENT EXCLUSIVELY AT PRIVATE EXPENSE.—Except as provided in subparagraphs (C), (D), and (G), in the case of an item or process that is developed by a contractor or subcontractor exclusively at private expense, the contractor or subcontractor may restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the government, or permit the use of the technical data by such persons.

10 U.S.C. § 2320(a)(2)(B) (2020), *redesignated*, 10 U.S.C. § 3771(b)(2) (2021). Notably, this paragraph denotes several exceptions limiting the restrictions that a contractor may place on technical data that the government uses for certain purposes, even if the data is developed at private expense. *Id*.

Subparagraph (C)—one of the three exceptions to § 2320(a)(2)(B)—states that the restrictions do not prevent release of technical data outside the government for certain purposes, including data necessary for OMIT, "form, fit, or function" data, data needed for "correction or change to data furnished by the United States," and data that is "publicly available or has been released or disclosed by the contractor or subcontractor without restriction on further release or disclosure." 10 U.S.C. § 2320(a)(2)(C)(i)-(iv) (2020), *redesignated*, 10 U.S.C. § 3771(b)(3)(A)-(D) (2021). Subparagraph (D)—another of the exceptions to § 2320(a)(2)(B)—permits release of privately developed data outside the government to support contractors if "necessary for emergency repair and overhaul," necessary for "interface" of two items or processes for "segregation" or "reintegration" purposes, or for use or release to a "foreign government." 10 U.S.C. § 2320(a)(2)(D) (2020), *redesignated*, 10 U.S.C. § 3771(b)(4) (2021).

If the government could not challenge restrictions on commercial technical data developed exclusively at private expense as FlightSafety suggests, then the contractor could restrict the government from releasing this technical data to support contractors outside the government for emergency and repair or for OMIT or form, fit, and function purposes. Congress did not enact § 2321(f) to negate an agency's ability to use and release commercial technical data for these specific purposes. FlightSafety's interpretation fails to comport with the "overall statutory scheme" and would render these provisions superfluous. *Utility Air Regulatory Grp.*, 573 U.S. at 320; *Boeing*, 983 F.3d at 1327. Thus,

15

the statutory scheme supports our interpretation of the plain meaning of the Contract's Validation clause.

Furthermore, the Air Force also asserts that the titles of the Validation clause and the statutory provision lend support to its reading of these provisions (gov't mot. at 19; gov't reply at 12). FlightSafety retorts that the titles contradict the Air Force's interpretation of the statute and the Contract's Validation clause (app. reply at 12-13). The Validation clause uses the title, "Presumption regarding development exclusively at private expense," DFARS 252.227-7037(b); and the statute uses the similar title, "Presumption of Development Exclusively at Private Expense." 10 U.S.C. § 2321(f) (2020), *redesignated*, 10 U.S.C. § 3784 (2021). Also, the related § 2320(a)(2)(B), includes the title, "Development Exclusively at Private Expense." 10 U.S.C. § 2320(a)(2)(B)(2020), *redesignated*, 10 U.S.C. § 3771(b)(2) (2021).

While the Air Force is correct that a title in a contractual or statutory provision may offer some interpretive assistance regarding an ambiguous provision, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947); *Automotive Mgt. Servs. FZE*, ASBCA No. 58352, 15-1 BCA ¶ 36,119 at 176,330 ("A contract's section headings cannot limit the plain language of its text."). The title is merely a "short-hand reference to the general subject matter" and is "not meant to take the place of the detailed provisions of the text." *Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014) (quoting *Trainmen*, 331 U.S. at 528). As discussed above, we believe the plain language of the statutory and contractual texts permit the Air Force to challenge FlightSafety's restrictions here. Although not dispositive, the titles support our analysis and are consistent with the plain meaning of these statutes and the DFARS Validation clause in the Contract.

C. *The Legislative History of the Statute Is Ambiguous and Unhelpful*

Each party asserts that the legislative history of 10 U.S.C. § 2321(f) supports its position (gov't mot. at 20-22; gov't reply at 13-15; app. resp. at 19-22; app. reply at 11). However, the plain language controls the interpretation of an unambiguous statute, as here. *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1389 (Fed. Cir. 2013). Indeed, ambiguous legislative history may not cloud the clear meaning of a statute. *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."); *cf. also Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) ("If a contractor's right to payment varied based on a future court's uncertain interpretation of legislative history, it would increase the Government's cost of contracting."). Here, the legislative history offers ambiguity, not clarity.

In particular, the Federal Acquisition Streamlining Act (FASA) enacted 10 U.S.C.

§ 2321(f), adding it to the technical data and validation statutes.  Federal Acquisition Streamlining Act, Pub. L. No. 103-355, § 8106(b), 108 Stat. 3243, 3393-94 (1994).  The Conference Report for this section of FASA states that the House of Representatives' version of the bill originally intended to "exempt commercial items from 10 U.S.C. 2320 (technical data) and 2321 (validation of proprietary data restrictions)."  H.R. Rep. No. 103-712, at 235 (Conf. Rep.), *reprinted in* 1994 U.S.C.C.A.N. 2607, 2665.  Indeed, the discarded House provision would have added a paragraph to 10 U.S.C. § 2320 stating that the "regulations prescribed under subsection (a) shall not apply to contracts for the purchase of commercial items."  H.R. 2238, 103rd Congress § 7008(b) (1994).[10]  As noted above, 10 U.S.C. § 2320(a) includes the provisions that would give the government a license permitting the release of technical data outside the government to support contractors for emergency and repair or, for OMIT or form, fit, and function purposes, even though the data was developed exclusively at private expense.  10 U.S.C. §§ 2320(a)(2)(B)-(D) (2020), *redesignated*, 10 U.S.C. §§ 3771(b)(2)-(4) (2021).

The legislative history notes that, rather than exempting commercial items as proposed by the House, the Senate provided that "for the purposes of technical data provisions in 10 U.S.C. 2320 and 10 U.S.C. 2321, a commercial item will be presumed to have been developed exclusively at private expense unless a federal agency can document that the item was developed, in whole or in part, at federal government expense." 1994 U.S.C.C.A.N. at 2665.  This language comports with the plain meaning of the statute as discussed above.

However, the last paragraph takes a turn that departs from the language of the statutes at issue:

> The conferees were concerned that a blanket waiver from these statutes could prevent the federal government from obtaining technical data rights on items developed with public funds. The conference approach would have the effect of exempting commercial items from the requirement to provide technical data (other than data on form, fit and function), unless the government can prove that an item was developed at government expense.

1994 U.S.C.C.A.N. at 2665.  FlightSafety touts these sentences in the legislative history because they focus on the apparent Congressional concern that the government would not obtain any technical data rights in commercial items developed with "public funds" or "at government expense."  Given this apparent concern with data developed at public

---

[10] https://www.congress.gov/103/bills/hr2238/BILLS-103hr2238rh.pdf (visited on Nov. 28, 2022).

expense, FlightSafety asserts that Congress intended § 2321(f) to bar any challenges to restrictions on data created at private expense (regardless of the exceptions in § 2320(a)).

The language in these sentences is far more ambiguous and less helpful than FlightSafety insists (and does not serve to create ambiguity in the statute, but only in the legislative history). If the last sentence were true, then it would mean FASA exempted a contractor from providing *any* commercial technical data, except for (1) form, fit, and function data, and (2) data developed at government expense. Were that true, a contractor would have no obligation to provide OMIT technical data or data otherwise publicly available, much less a license permitting the government to release it outside the government to support contractors for emergency and repair. *See* 10 U.S.C. §§ 2320(a)(2)(C)-(D) (2020), *redesignated*, 10 U.S.C. § 3771(b)(3)-(4) (2021). However, as noted above, the Conference Report states the conferees specifically eliminated the House provision that would have exempted commercial items from these provisions in § 2320(a). Thus, Congress did not adopt the House approach and meant to assure that § 2320(a) applied to commercial items contracts regarding data exclusively developed at private expense.

Ultimately, the ambiguous legislative history may not muddy the plain meaning of the statutes. *Milner*, 562 U.S. at 572. Here, the Air Force may challenge FlightSafety's restrictive markings on the commercial technical data even though the Air Force does not challenge whether FlightSafety developed the data exclusively at private expense.

IV.      *The Air Force Obtained an Unrestricted Rights License in FlightSafety's Commercial Technical Data, Which Permits Manufacturing New Items with the Data*

The Air Force received an unrestricted rights license in FlightSafety's commercial technical data. The OMIT provision of the Commercial Technical Data clause includes an exception that does not permit the use of OMIT data for manufacturing purposes. However, as discussed below, FlightSafety has agreed to give an unrestricted rights license in this data to the Air Force, which moots this limitation. Moreover, the unrestricted rights license permits the Air Force to use that data to manufacture or reprocure the commercial item. Contrary to FlightSafety's arguments, the Commercial Technical Data clause, DFARS policy, and the statute governing the DFARS technical data clauses all dictate this result.

A. *FlightSafety Has Agreed to Give the Air Force an Unrestricted Rights License in the Data, which Moots FlightSafety's Argument that any OMIT Data is "Detailed Manufacturing or Process Data"*

The Commercial Technical Data clause states that "[t]he Government shall have the unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so, that – . . . (iv) [a]re necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data)." DFARS 252.227-7015(b)(1)(iv). In other words, the Commercial Technical Data clause gives the Air Force an unrestricted rights license in OMIT data "other than detailed manufacturing or process data." DFARS 252.227-7015(b)(1)(iv); Government Accountability Office, *Defense Acquisitions: DOD Should Take Additional Actions to Improve How it Approaches Intellectual Property* at 16 n.40 (GAO-22-104752 – Nov. 2021) (noting that "Congress excluded contractors' protected manufacturing data, known as 'detailed manufacturing or process data'" from the similar unlimited rights data license in the Noncommercial Technical Data clause).[11] The Contract defines "detailed manufacturing or process data" as "technical data that describe the steps, sequences, and conditions of manufacturing, processing or assembly used by the manufacturer to produce an item or component or to perform a process." DFARS 252.227-7013(a)(6). If the OMIT data constitutes "detailed manufacturing or process data" the government does not obtain an unrestricted rights license under paragraph (b)(1) of the Commercial Technical Data clause. Instead the government obtains the more restrictive license rights under paragraph (b)(2), which prevents the government from releasing the data outside the government (except for emergency repair or overhaul) or "us[ing] the technical data to manufacture additional quantities of the commercial items . . . ." DFARS 252.227-7015(b)(2)(i).

FlightSafety originally argued that its drawings are detailed manufacturing or process data and, thereby, not subject to the unrestricted rights license (app. resp. at 44; app. reply at 16-19). On the other hand, the Air Force argued that the drawings were OMIT data, but not detailed manufacturing and process data, which the Air Force counterintuitively argued would nevertheless allow the government to reprocure and manufacture additional items using FlightSafety's OMIT data (gov't reply at 8-9; gov't sur-reply at 2-6).[12]

---

[11] https://www.gao.gov/assets/gao-22-104752.pdf (visited Nov. 28, 2022)

[12] The Air Force moved to file a sur-reply. Generally, sur-replies are disfavored, particularly if a non-movant has nothing new to say and simply seeks to get the last word. *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 431 (2015). Nevertheless, we will grant a non-movant leave to file a sur-reply, for example, where the non-movant seeks to challenge new facts or arguments raised for the first time in a movant's reply brief. *See Cooper/Ports Am., LLC*, ASBCA Nos. 61349, 61350, 19-1 BCA ¶ 37,285 at 181,402 n.1. Here, FlightSafety acknowledges that the Air Force is responding, in part, to a new argument raised in FlightSafety's reply brief and, based on our review,

19

However, the parties have mooted this issue through partial settlement. The Board applies the United States Constitution's Article III case or controversy justiciability standards because we act in a judicial capacity when considering appeals even though the Board is an Article II administrative body. *SWR, Inc.*, ASBCA No. 56708, 12-1 BCA ¶ 34,988 at 171,945 (citing *United States v. Utah Constr. & Min. Co.*, 384 U.S. 394, 422 (1966)). An appeal or question presented becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *L3 Tech., Inc.*, ASBCA No. 61811 *et al.*, 21-1 BCA ¶ 37,808 at 183,602 (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

As part of their partial settlement and after the parties had submitted their briefs, the parties agreed that FlightSafety would provide the Air Force with an unrestricted rights license in the technical data at issue – the 21 drawings. This moots the question of whether the OMIT data could have qualified as "detailed manufacturing or process data" and, therefore, exempt from the unrestricted rights license in DFARS 252.227-7015(b)(1). "This, then, is simply another instance in which one issue in a case has become moot, but the case as a whole remains alive because other issues have not become moot." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Thus, we turn to the remaining live disputes regarding whether the Air Force may use FlightSafety's data obtained under the unrestricted rights license to manufacture additional commercial items and whether any of FlightSafety's restrictive legends contradict those license rights.

B. *The Plain Meaning of the Contract Permits the Government to Manufacture Additional Items Using Technical Data Subject to the Unrestricted Rights License*

As we did with the Validation clause, we start by looking at the plain language of the Contract, particularly the Commercial Technical Data and Noncommercial Technical Data clauses. *Boeing*, 983 F.3d at 1326; *Hercules*, 292 F.3d at 1380-81. We read the Contract to give effect and meaning to each provision. *NVT*, 370 F.3d at 1159. The plain language of the Commercial Technical Data clause permits the Air Force to manufacture additional items using technical data subject to the unrestricted rights license. And, even when compared with language in the Noncommercial Technical Data clause of the Contract, we come to the same conclusion.

---

the remainder of the sur-reply also responds to a newly raised argument. Thus, we grant the Air Force's request to file a sur-reply.

1. *The Plain Meaning of the Commercial Technical Data Clause Permits the Air Force to Manufacture Additional Items Using Technical Data Subject to the Unrestricted Rights License*

As discussed above, the Commercial Technical Data clause gives the government two different license rights. First, as noted above, the unrestricted rights license in paragraph (b)(1) gives the government the "unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so." DFARS 252.227-7015(b)(1). The unrestricted rights license includes no limits to the use or disclosure of a contractor's commercial technical data delivered to the government with these license rights. *See Advantor Sys. Corp. v. DRS Tech. Serv., Inc.*, 678 F. App'x 839, 857 (11th Cir. 2017) ("In short, if the Manuals contain exclusively [form, fit, and function] or OMIT Data, then the Air Force had, by default, unrestricted rights to disclose the Manuals to [a competitor] for the purpose of helping the Air Force maintain its security systems."). As noted above, FlightSafety has agreed to give the Air Force an unrestricted rights license in the 21 drawings of commercial technical data.

Second, paragraph (b)(2) includes more restrictive license rights: "Except as provided in paragraph (b)(1) of this clause, the Government may use, modify, reproduce, release, perform, display, or disclose technical data within the Government only." DFARS 252.227-7015(b)(2). The next sentence in this paragraph states: "The Government shall not - (i) Use the technical data to manufacture additional quantities of the commercial items . . . ." DFARS 252.227-7015(b)(2)(i). FlightSafety asserts this second sentence in paragraph (b)(2) explicitly prohibits the Air Force from using or disclosing any data covered by the Commercial Technical Data clause for manufacturing purposes (app. resp. at 42-43; app. reply. at 17). The Air Force asserts that the prohibition on manufacturing applies only to paragraph (b)(2), not the unrestricted rights license in paragraph (b)(1) (gov't mot. at 18). We agree with the Air Force.

The Air Force relies on the maxim *expressio unius est exclusio alterius*, "the expression of one thing is the exclusion of the other." *Elkem Metals Co. v. United States*, 468 F.3d 795, 801 (Fed. Cir. 2006) (citation omitted); *ITT Def. Comm. Div.*, ASBCA No. 44791, 98-1 BCA ¶ 29,590 at 146,703 (stating the maxim "is rightly applied as an aid in contract interpretation"). "The force of any negative implication . . . depends on context." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013). And, here the context demonstrates that the prohibition on using the technical data for manufacturing applies to the data subject to the license in paragraph (b)(2), not the unrestricted rights license in paragraph (b)(1).

Contextually, the Commercial Technical Data clause includes the manufacturing prohibition in paragraph (b)(2), not in paragraph (b)(1). Notably, paragraph (b)(1) places no use or disclosure limitation on the unrestricted rights license except for OMIT data that is "detailed manufacturing or process data." DFARS 252.227-7015(b)(1)(iv). As noted

above, "detailed manufacturing or process data" is covered by the license in paragraph (b)(2) – the same license rights that prohibit manufacturing additional commercial items – not the unrestricted rights license in paragraph (b)(1). We would expect to see similar use or disclosure restrictions in the unrestricted rights license if the Commercial Technical Data clause intended to prevent the manufacture of additional products. There are none besides the exception for "detailed manufacturing or process data." Thus, the Commercial Technical Data clause prohibits manufacturing additional commercial items only for the technical data subject to the license in paragraph (b)(2), not the unrestricted rights license in (b)(1).

Further supporting this plain language reading of the clause, the DFARS also explains the scope of the license rights allocated in the Commercial Technical Data clause. DFARS 227.7102-2(a). The DFARS explains that the data subject to the license in paragraph (b)(2) of the Commercial Technical Data clause "may not be used to manufacture additional quantities of the commercial items . . . ." *Id*. However, the DFARS then states that "[t]hose restrictions do not apply to the technical data described in 227.102-1(a)," which lists the same types of data covered by the unrestricted rights license in paragraph (b)(1) of the Commercial Technical Data clause. *Compare* DFARS 227.102-1(a), *with* DFARS 252.227-7015(b)(1). Thus, this further confirms that the government may manufacture additional items using data obtained with an unrestricted rights license in paragraph (b)(1) of the Commercial Technical Data clause.[13]

---

[13] FlightSafety also notes that the DFARS policy specifically states the Defense Department "shall acquire only the technical data customarily provided to the public with a commercial item or process" (app. resp. at 15, app. reply at 16). However, as FlightSafety elsewhere recognizes (app. reply at 14), the clause, read in full, creates several exceptions that are covered by the unrestricted rights license in the Commercial Technical Data clause. In particular, the Defense Department "shall acquire only the technical data customarily provided to the public with a commercial item or process, *except technical data that* –

> (1) Are form, fit, or function data;
>
> (2) Are required for repair or maintenance of commercial items or processes, or for the proper installation, operating, or handling of a commercial item, either as a stand alone unit or as a part of a military system, when such data are not customarily provided to commercial users or the data provided to commercial users is not sufficient for military purposes; or
>
> (3) Describe the modifications made at Government expense to a commercial item or process in order to meet the requirements of a Government solicitation."

DFARS 227.7102-1(a)(1)-(3) (emphasis added).

2. *The Plain Meaning of the Contract Does Not Change Even When Comparing the Commercial Technical Data Clause with the Noncommercial Technical Data Clause*

FlightSafety also looks beyond the Commercial Technical Data clause to assess the meaning of the Contract. FlightSafety asserts that reading the Commercial Technical Data clause together with the Noncommercial Technical Data clause alters the plain meaning of the Commercial Technical Data clause standing alone. In particular, FlightSafety asserts that commercial technical data subject to the unrestricted rights license cannot be used "for any purpose" like unlimited rights in the Noncommercial Technical Data clause. Instead, FlightSafety asserts the Air Force may only use the unrestricted rights data for the purpose the data is provided to the Air Force, such as for OMIT purposes (app. resp. at 13-14, 41-42; app. reply at 17-18). We disagree.

FlightSafety compares the unrestricted rights licensing language in the Commercial Technical Data clause to similar, but not identical language, in the unlimited rights license in the Noncommercial Technical Data clause.[14] The Commercial Technical Data clause delineates the "unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so" regarding several types of data, such as OMIT data. DFARS 252.227-7015(b)(1). By contrast, the Noncommercial Technical Data clause defines "unlimited rights" to provide license "rights to use, reproduce, perform, display, release, or disclose technical data in whole or in part, in any manner, and ***for any purpose whatsoever***, and to have or authorize others to do so" for some overlapping types of data, such as OMIT data (but also covering data developed exclusively with government funds that are not listed in the Commercial Technical Data clause). DFARS 252.227-

---

[14] *See, e.g.*, Leonard Rawicz, *Commercial Items Technical Data Policy Revisited: Understanding the DFARS Policy*, 28 Nash & Cibinic Rep. ¶ 27 (May 2014) ("The unrestricted rights license is similar to the 'unlimited rights' license that applies to technical data pertaining to noncommercial items technical data covered in the DFARS 252.227-7013 technical data clause . . . ."); Matthew S. Simchak & David A. Vogel, *Licensing Software and Technology to the U.S. Government* 309 (2000) ("Although the wording is different from the definition of 'unlimited rights' in DFARS 252.227-7013 (NOV 1995), there is no perceptible meaningful difference in substantive result: data may be used without restriction or limitation by the Government and by third parties."); *Federal Circuit Bar Association: Study of Best Practices and Opportunities for Improvements in Federal Procurement Contracting*, 24 Fed. Cir. B.J. 319, 325 (2015) ("Unrestricted rights in the technical data delivered to DOD with commercial items pursuant to the DFARS 7015 clause are essentially the same as the unlimited rights license that DOD obtains in noncommercial technical data that pertains to an item, component, or process developed at government expense.").

7013(a)(16) (emphasis added); (R4, tab 4 at 41 (Task Order incorporating clause); tab 14 at 90 (Contract incorporating clause)). Notably, both the Commercial and Noncommercial Technical Data clauses give the government an unrestricted or unlimited rights license in some data exclusively developed at private expense, such as OMIT data. *Compare* DFARS 252.227-7013(b)(1)(v), *with* DFARS 252.227-7015(b)(1)(iv).

FlightSafety asserts that reading the Commercial Technical Data clause as giving the government the ability to use the unrestricted rights data "for any purpose whatsoever" would render that phrase "superfluous, void, or insignificant" in the Noncommercial Technical Data clause. *Raytheon Co.*, ASBCA No. 54907, 11-2 BCA ¶ 34,870 at 171,519 (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted)). And, when observing the plain language of a contract, we must look at the entire contract, not just one clause. *Pac. Gas & Elec.*, 536 F.3d at 1288 ("Generally, this court also construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

We agree that the license definitions are not identical, but we need not decide how the government could use unrestricted versus unlimited rights data in every circumstance.[15] We need only resolve the material question presented here – whether the Commercial and Noncommercial Technical Data clauses read together prohibit the Air Force from using FlightSafety's unrestricted rights data for manufacturing additional items. As noted above, the Commercial Technical Data clause only prohibits manufacturing additional items with the license provided in paragraph (b)(2) of the Commercial Technical Data clause, not the unrestricted rights license in paragraph (b)(1). DFARS 252.227-7015(b)(2)(i). Similarly, the Noncommercial Technical Data clause only prohibits manufacturing additional items with the limited rights license, not the unlimited rights license. DFARS 252.227-7013(a)(14) ("The Government may not, without the written permission of the party asserting limited rights . . . use the technical data for manufacture . . . ."). Even though the definitions are not identical, neither clause prohibits the government from using data

---

[15] The Air Force counters that the dictionary definition of "unrestricted" demonstrates that the term is synonymous with "unlimited" (gov't mot. at 16 n.6). However, because the Contract explicitly defines these terms in the Commercial and Noncommercial Technical Data clauses, using a dictionary does not assist us in interpreting the Contract. *Am. Express Co. v. United States*, 262 F.3d 1376, 1381 n.5 (Fed. Cir. 2001) ("It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation."); *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) ("[T]o interpret disputed contract terms, 'the context and intention [of the contracting parties] are more meaningful than the dictionary definition.'" (quoting *Rice v. United States*, 428 F.2d 1311, 1314 (Ct. Cl. 1970)).

subject to an unrestricted or unlimited rights license to manufacture additional commercial items.

This plain reading of the clauses also results in treating subcontractor commercial technical data, like FlightSafety's, similarly in both the Commercial and Noncommercial Technical Data clauses. Notably, subcontractor commercial technical data developed with government funds (even partially) are subject to the Noncommercial Technical Data clause, not the Commercial Technical Data clause (which relates to commercial technical data developed with exclusively private funds). DFARS 252.227-7015(e)(2) ("This clause will govern the technical data pertaining to any portion of a commercial item that was developed exclusively at private expense, and the clause at 252.227-7013 will govern the technical data pertaining to any portion of a commercial item that was developed in any part at Government expense."). So, it makes sense that these contract clauses treat similar types of commercial technical data similarly in both clauses; particularly here, where neither clause prohibits the government from using unlimited or unrestricted rights data to manufacture additional commercial items.

Ultimately, the plain language of the Contract permits the Air Force to manufacture additional items based on the unrestricted rights license the Air Force obtains in FlightSafety's data.

C. *Statute, Legislative History, and Regulatory History Support the Contract Clause's Plain Meaning that the Government May Manufacture Additional Commercial Items Subject to Unrestricted Rights*

FlightSafety asserts that statutory policy (as also reflected in the DFARS implementation of the statute), contradicts the plain meaning of the contract clauses and that the Air Force may not use unrestricted rights data for manufacturing additional commercial items. In particular, FlightSafety asserts that FASA's requirement to use commercial items to the "maximum extent practicable" resulted in Congress exempting commercial technical data from the statutory requirements in 10 U.S.C. § 2320(a) (2020), *redesignated*, 10 U.S.C. §§ 3771 (app. resp. at 14-15). FlightSafety urges that FASA dictated a more favorable DFARS policy toward commercial items and prohibited the government's use of technical data to manufacture additional commercial items (*id*.). Contrary to FlightSafety's assertions, FASA did not exempt commercial items from the statutory technical data requirements. The Commercial and Noncommercial Technical Data DFARS clauses in the Contract faithfully implement statutory requirements.

Because the Contract's Commercial Technical Data clause (like the Validation clause) "implements a statutory enactment," we again "inquire into the governing statute and its purpose." *Roedler*, 255 F.3d at 1352. Among other things, FASA culminated a decades-long debate regarding how and to what extent the government could obtain technical data license rights when procuring commercial items. Government contract

25

clauses and policy oscillated between the government taking few rights in privately-developed commercial technical data and taking significantly more rights in this data. After passing seven statutes in 10 years on this issue, Congress ultimately decided in FASA that the Defense Department should not exempt commercial items from the technical data statutory requirements, which assured the government unrestricted license rights in some privately-developed data (such as OMIT and form, fit, and function data).

In the 1950s, the applicable regulations (and associated contract clauses) prohibited the government from obtaining proprietary commercial technical data or, when it did, only for a limited purpose. *Bell Helicopter Textron*, ASBCA No. 21192, 85-3 BCA ¶ 18,415 at 92,388-89 (noting that the Rights in Data-Limited clause, Armed Services Procurement Regulations 9-202.2(a) (Rev. 21) in supply contracts allowed the Government to obtain proprietary data "where the Government had a specific need to obtain the proprietary data for a limited purpose" or proscribed the government "against obtaining data under the contract in the first place").

In 1964, the government adopted a new policy that permitted the government to obtain "limited rights" in commercial technical data developed at private expense, but "essentially precluding release outside the Government such as for competitive future procurement (with very narrow exceptions) . . . ." *Id*. at 92,391. However, even going back to the 1960s, the procurement regulations made some privately developed data, such as OMIT data, subject to an unlimited rights license. 30 Fed. Reg. 6965, 6970-71 (May 25, 1965) (codified at 32 C.F.R. § 9.203(b), until superseded by the DFARS); *see also* 49 Fed. Reg. 38,549, 38,575, 38,591-92 (Oct. 1, 1984) (codified, as amended, as DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE (MAY 1981)).

In the early 1980s, concerns about excessive prices in procuring spare parts led the Secretary of Defense to issue a blanket deviation from the regulations by requiring contractors to (1) relinquish to the government greater license rights in contractors' privately-developed technical data as a condition of award and (2) provide unlimited rights to data after a period of five years. Report of the Acquisition Law Advisory Panel to the United States Congress, *Streamlining Defense Acquisition Laws* at 5-3 (Jan. 1993) (Section 800 Panel Report); *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,361.

In 1984, Congress responded to agency concerns regarding excessive spare part prices. Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, § 1202, 98 Stat. 2492, 2588 (Oct. 19, 1984) ("The Congress finds that recent disclosures of excessive payments by the Department of Defense for replenishment parts have undermined confidence by the public and Congress in the defense procurement system."); *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,361. The bill's conference report explained that the "restrictions on the government's right to release the technical data that would allow other companies to manufacture an item" inhibited reprocurement and resulted in "excessively priced spare parts . . . ." *Raytheon Co. v. United States*, 160 Fed. Cl. 428, 444 (2022)

26

(quoting H.R. Rep. No. 98-1080, at 318 (Conf. Rep.), *reprinted in*, 1984 U.S.C.C.A.N. 4258, 4296-97).  The statutes directed Federal agencies to promulgate regulations in the FAR and DFARS regarding technical data rights, weighing several factors such as the source of the funding and taking account of the "interest of the United States in increasing competition and lowering costs by developing and locating alternative sources of supply and manufacture."  98 Stat. at 2589, 2595-96; Small Business and Federal Procurement Competition Enhancement Act of 1984, Pub. L. No. 98-577, § 301, 98 Stat. 3066, 3074-75 (Oct. 30, 1984) (codified at 41 U.S.C. § 251, *recodified at*, 41 U.S.C. § 2302).[16]

In 1986, Congress returned to this issue after the Defense Department failed to issue DFARS rules fully implementing the 1984 statutes.  *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,362-63.  Using language that has survived in the United States Code, Congress directed the Defense Department (but not civilian agencies) to include three tiers of license rights in the DFARS:  (1) data developed exclusively with government funds would give the government the "unlimited right" to use the data or "release or disclose the technical data to persons outside the government or permit the use of the technical data by such persons;" (2) data developed exclusively with private funds permitted contractor or subcontractor to "restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the government or permit the use of the technical data by such persons;" and (3) "government purpose rights" for data developed with mixed funds.  Department of Defense Authorization Act, 1987, Pub. L. No. 99-661, § 953(a), 100 Stat. 3816, 3949-50 (Nov. 14, 1986) (codified at 10 U.S.C. § 2320(a)(2), *redesignated*, 10 U.S.C. § 3771(b)).  Also, notwithstanding the private development of technical data, the 1986 statute directed the DFARS to allow the government to "release or disclose technical data to persons outside the Government, or permit the use of technical data by such persons" regarding four types of data:  (1) contractor changes or corrections to data furnished by the government; (2) form, fit, and function data; (3) OMIT data; and (4) publicly available data previously released or disclosed without restrictions.  100 Stat. at 3950 (codified at 10 U.S.C. § 2320(a)(2)(C), *redesignated*, 10 U.S.C. § 3771(b)(3) (2021)).

---

[16] The statutory provisions governing civilian agencies provided somewhat more guidance, requiring that any FAR provisions give the government an unlimited rights license in technical data developed exclusively with government funds if the data "was required as an element of performance under a contract" and necessary "to ensure the competitive acquisition of supplies or services that will be required in substantial quantities in the future."  98 Stat. at 3074-75 (codified at 41 U.S.C. § 251, *recodified at*, 41 U.S.C. § 2302).  However, the statutes both addressed the Defense Department deviation, stating that the government "may not" condition procurement award on contractors relinquishing privately-developed technical data relating to the design, development, or manufacture of these products (except data necessary to "operate and maintain the product or use the process").  98 Stat. at 2589; 98 Stat. at 3074.

The 1986 statute was silent regarding commercial items, but the conference report for the legislation expected that the "Department of Defense should generally seek to acquire the same rights in data that a commercial customer would in acquiring the same product." H.R. Rep. 99-1001 at 511, *reprinted in*, 1986 U.S.C.C.A.N. 6529, 6570. As an example, a commercial buyer "would not receive unlimited rights to use, release or disclose technical data necessary to manufacture the item or perform the necessary processes to manufacture the item." *Id*. "[T]he government should not require a contractor to provide technical data relating to commercial products, except the data necessary to maintenance, repair and training." *Id*. at 512, *reprinted in*, 1986 U.S.C.C.A.N. at 6571. Thus, notwithstanding the impetus to honor commercial practices, Congress recognized the statute created exceptions for data necessary for maintenance, repair, and training.

In 1987, the Defense Department implemented the 1984 and 1986 statutes in the DFARS. *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,364; 52 Fed. Reg. 12,390 (Apr. 16, 1987) (final rule); 52 Fed. Reg. 2082 (Jan. 16, 1987) (proposed rule). However, shortly thereafter, Congress passed another statute to direct the DFARS to include provisions more favorable to contractors, including an explicit provision prohibiting the Defense Department from conditioning award on a contractor relinquishing technical data rights that exceeded statutory requirements. National Defense Authorization Act for Fiscal Years 1988 and 1989, Pub. L. No. 100-180, § 808(a), 101 Stat. 1019, 1128-29 (Dec. 4, 1987) (codified at 10 U.S.C. §§ 2320(a)(1) & (2)(F), *redesignated*, 10 U.S.C. §§ 3771(a)(2)(B) & (8)(A)).[17] The conference report explained that "clarification was deemed necessary in part because the regulations issued by the department are inconsistent with the provisions of law as adopted" in the 1986 statute. H.R. Rep. No. 100-446 at 659, *reprinted in*, 1987 U.S.C.C.A.N. 1355, 1771. "In the interim . . . the conferees believe the Secretary of Defense should rescind or revise any current Department of Defense regulation which is inconsistent with the legislative provisions adopted in" the 1986 statute. *Id*.

In 1988, the Defense Department implemented the new statutory requirements. As pertinent here, the DFARS provisions incorporated the various statutory requirements into the forerunner to the Noncommercial Technical Data clause. 53 Fed. Reg. 43,698, 43, 709-14 (Oct. 28, 1988) (codified as DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE (OCT 1988). However, reflecting the 1986 statute's conference report, the Defense Department's interim rule for DFARS Part 227 included a new policy limiting the agency's acquisition of privately-developed technical data when purchasing commercial items:

---

[17] Congress also codified a contractor-favored definition of "developed exclusively at private expense," which permitted technical data to retain its "private" designation even if the government paid for the technical data through a contractor's recovery of indirect costs for independent research and development or bid and proposal costs. NDAA § 808(a)(5)(B), 101 Stat. at 1129 (codified at 10 U.S.C. § 2320(a)(3), *redesignated*, 10 U.S.C. § 3771(c)(2)).

It is DoD policy to encourage the use of commercial items to the maximum practicable extent (see 210.002 (S—70)). To further this policy, it is DoD policy to limit acquisition of technical data and rights in technical data pertaining to commercial items developed at private expense; neither data nor data rights should be acquired for the competitive acquisition of such a commercial item. Therefore for such commercial items, the DoD will normally only obtain technical data and data rights as provided in 10 U.S.C. 2320(a)(2) (C) and (D) (see 227.472-3(a)(l)), such as those needed for operation, maintenance, installation, and training. Additional technical data may not be acquired unless approved by the chief of the contracting office, and greater data rights may not be acquired unless approved by the head of the contracting activity.

53 Fed. Reg. 43,698, 43,701 (Oct. 28, 1988) (codified at DFARS 227.47-2(b) (1989)). Thus, the policy stated that the Defense Department could not use the commercial technical data for manufacturing – *i.e.* "for the competitive acquisition of such a commercial item." *Id*.

In 1989, Congress mandated that the Defense Department promulgate new regulations for obtaining commercial items and directed the Secretary of Defense to conduct an analysis "[w]hether to establish a presumption that the Department of Defense should not request technical data on commercial items." National Defense Authorization Act for Fiscal Years 1990 and 1991, Pub. L. No. 101-189, §§ 824(b)(1), (c)(1)(C), 103 Stat. 1352, 1504-05 (1989).

In April 1991, the Defense Department published interim rules for DFARS Part 211 regarding the acquisition of commercial items, which "[l]imit the acquisition of technical data." 56 Fed. Reg. 18,610, 18,610 (Apr. 23, 1991). The interim rules included a technical data contract clause for commercial items – the forerunner to the Commercial Technical Data clause: DFARS 252.211-7015, TECHNICAL DATA AND COMPUTER SOFTWARE—COMMERCIAL ITEMS (MAY 1991), 56 Fed. Reg. at 18,624-25. The commercial items technical data clause allowed the government a license "without restrictions" only for technical data "customarily provided to the public without restrictions or that are in the public domain" or technical data "purchased by the Government to document modifications to the contractor's standard commercial item configuration . . . ." 56 Fed. Reg. at 18,624-25. The Defense Department obtained an unrestricted rights license in data that would otherwise lose protection in the commercial marketplace, such as data publicly released that no longer carried trade secret, proprietary, or confidential protection. *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1323 (Fed. Cir. 2003) (noting that information released into the public domain undoes a contractor's claim of

29

confidentiality and protection as a trade secret); *CANVS Corp.*, 18-1 BCA ¶ 37,156 at 180,892 ("Information in the public domain or that is common knowledge in an industry cannot be considered proprietary or a trade secret."). Moreover, the new commercial items contract clause also stated: "The Government shall not use the technical data . . . to manufacture additional quantities of the commercial items to be furnished under this contract . . . ." 56 Fed. Reg. at 18,625. The DFARS commercial items provisions took precedence over conflicting DFARS provisions, such as the technical data provisions in DFARS Part 227. 56 Fed. Reg. at 18,611 ("In the event of a conflict among the part 211 [commercial items] regulatory text and any other FAR or DFARS regulatory text, the part 211 regulatory text shall control and have precedence.").

Had this 1991 DFARS provision remained in effect, it would strongly support FlightSafety's position in this appeal, because the 1991 provision most closely approximated commercial practice by significantly limiting the technical data the government could acquire and use for manufacturing. Instead, subsequent statutes, including FASA, resulted in the reversal of this 1991 DFARS commercial technical data policy and standard contract clause.

In December 1991, Congress created an advisory panel of experts – the 800 Panel – to look at streamlining acquisition laws. National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 800, 104 Stat. 1485, 1587 (Nov. 5, 1990). In 1993, among other recommendations, the 800 Panel recommended that Congress codify the commercial technical data policy enunciated in the 1988 DFARS Part 227 provisions. 800 Panel Report at 5-25 ("The DFARS state that DOD will normally only obtain technical data and data rights with regard to commercial items as provided in 10 U.S.C. § 2320(a)(2)(C) & (D). The proposed statutory amendment to section 2320 adopts this policy."). The 800 Panel Report does not make any reference to the 1991 DFARS Part 211 provisions regarding commercial items.

While the 800 Panel met and prepared its report, Congress also directed the Defense Department to "prescribe final regulations" implementing 10 U.S.C. § 2320(a) that would "supersede the interim" 1988 DFARS provisions. National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-190, §§ 807(a), 105 Stat. 1290, 1421-22 (Dec. 5, 1991). To accomplish this, Congress created a "government-industry committee for the purpose of developing regulations to recommend to the Secretary of Defense." *Id.* § 807(a) &(b), 105 Stat. at 1422.

In its report, the government-industry committee addressed the conflicting provisions in the 1988 DFARS Part 227 technical data provisions and the 1991 DFARS Part 211 commercial items provisions. Government-Industry Technical Data Advisory Committee, Report to the Secretary of Defense at 14. Concerned that "unrestricted disclosure might affect a company's business[,]" the industry representatives sought to replace the DFARS Part 211 technical data provisions with new provisions in DFARS 227

that would eliminate a standard contract clause and "would require the negotiation of specific license rights whenever the Government needed rights in technical data pertaining to commercial items." *Id*. The government representatives rejected the industry suggestion and determined that "a standard clause was necessary to grant the government an unrestricted license in the technical data statutorily exempt from restrictions on use or disclosure" in 10 U.S.C. § 2320(a). *Id*. Although rejecting the substance of the industry representatives' request, the government representatives agreed to move the commercial technical data provisions from DFARS Part 211 to DFARS Part 227. *Id*. In June 1994, the Defense Department promulgated new proposed rules for DFARS Part 227, which incorporated the government-industry report's conclusions, including moving the DFARS Part 211 commercial technical data provisions to DFARS Part 227. 59 Fed. Reg. 31,584, 31,585, 31,612 (June 20, 1994).

In October 1994, Congress passed FASA, which required that "federal agencies, to the maximum extent practicable, procure commercially available technology to meet their needs." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 983 (Fed. Cir. 2018); Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104(a), 108 Stat. 3243, 3391 (1994) (codified as amended at 10 U.S.C. § 2377(b)(1) (2020), *redesignated*, 10 U.S.C. § 3453(b)(1) (2021)) ("The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable . . . acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency . . . ."). FASA required the FAR to "include contract clauses 'that are determined to be consistent with standard commercial practice.'" *Gen'l Injectables & Vaccines, Inc. v. Gates*, 527 F.3d 1375, 1378 (Fed. Cir. 2008) (quoting FASA, § 8002(b)(1)(B), 108 Stat. at 3386). FASA also listed specific FAR and DFARS provisions that would be inapplicable to commercial items procurements. *See, e.g.*, FASA § 8105, 108 Stat. at 3392-93.

As noted earlier in this decision, Congress considered making the statutory technical data requirements (and implementing regulations) inapplicable to commercial items: "The regulations prescribed under subsection (a) [of 10 U.S.C. § 2320] shall not apply to contracts for the purchase of commercial items . . . ." H.R. 2238, 103rd Congress § 7008(b) (1994).[18] Indeed, the language in the House bill went beyond the 800 Panel's recommendation and would have effectively ratified the 1991 DFARS Part 211 provisions, which conformed more closely to standard commercial practice and ignored the statutory framework of data rights based on development with private or public funding in 10 U.S.C. § 2320(a) (2020), *redesignated*, 10 U.S.C. § 3771(a) (2021).

---

[18] https://www.congress.gov/103/bills/hr2238/BILLS-103hr2238rh.pdf (visited on Nov. 28, 2022).

However, Congress passed FASA into law without the House provision. FASA § 8105, 108 Stat. at 3392-93. The statute intentionally omitted the draft provision. "Silence or omission in a statute is an intentional act and can be just as significant as specific statutory direction." *Beres v. United States*, 64 Fed. Cl. 403, 416 (2005); *cf. also Ebert v. Poston*, 266 U.S. 548, 554 (1925) ("A *casus omissus* does not justify judicial legislation. This Act is so carefully drawn as to leave little room for conjecture. It deals with a single subject and does so comprehensively, systematically, and in detail." (citation omitted)). Thus, FASA (as finally passed) does not support FlightSafety's position because Congress did not exempt commercial items technical data rights from the requirements of 10 U.S.C. § 2320(a) (2020), *redesignated*, 10 U.S.C. § 3771(a) (2021).

On June 28, 1995, the Defense Department issued a final rule that fully implemented the statutory directives regarding technical data. 60 Fed. Reg. 33,464 (June 28, 1995). As to the commercial technical data clause, the Defense Department left little doubt that it was rejecting the approach from DFARS Part 211 that more closely conformed to commercial transactions: "One commentor suggests the license rights granted the Government by the [Commercial Technical Data] clause at 252.227–7015 are inconsistent with those granted to commercial customers. The suggestion is not adopted. Rights under that clause are consistent with 10 U.S.C. 2320." *Id*. at 33,465. The Commercial Technical Data clause implemented in the 1995 DFARS is materially identical to the Commercial Technical Data clause in the Contract. For example, the 1995 DFARS standard Commercial Technical Data clause implemented the statutory requirement that the government obtains unrestricted rights to certain types of privately-developed data (such as OMIT data). *Compare* 60 Fed. Reg. at 33,497 (codified at DFARS 252.227-7015), *with* 10 U.S.C. § 2320(a)(2)(C), *redesignated*, 10 U.S.C. § 3771(b)(3) (2021). The clause restricted manufacturing only to the license rights in paragraph (b)(2) of the Commercial Technical Data clause, as it is in the current Commercial Technical Data clause. 60 Fed. Reg. at 33,497. Thus, consistent with FASA, the Defense Department did not exempt commercial items from the technical data license requirements of the statute.

Finally, FlightSafety asserts that a conference report for the National Defense Authorization Act for Fiscal Year 2001 demonstrates congressional intent to prohibit the Defense Department from using technical data with unrestricted rights to manufacture and reprocure commercial items (app. resp. at 41-42; app. reply at 18-19). First, FlightSafety quotes a discussion under a section titled: "Legislative Provisions Not Adopted." H.R. Rep. No. 106-945 at 832-33 (2000) (Conf. Rep.).[19] Because this subsequent legislative history resulted in no change to the statutory provisions at issue, we give it little weight. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) ("[E]ven when it would otherwise be useful, subsequent legislative history will rarely

---

[19] https://www.govinfo.gov/content/pkg/CRPT-106hrpt945/pdf/CRPT-106hrpt945.pdf (visited Nov. 28, 2022).

override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.").

Second, as the Air Force correctly notes, the legislative history does not support FlightSafety's position (gov't reply at 6-7). FlightSafety touts this House Report as recognizing the limited scope of the government's rights in unrestricted rights data (such as OMIT data) because the report states that "section 2320 reserves the government's limited right to technical data" necessary for OMIT purposes even when privately-developed. H.R. Rep. No. 106-945 at 833. However, the House Report later indicates that when it mentioned the government's "limited right" it was not talking about license rights, but about how much data to order by providing "executive branch officials with the flexibility to determine what data, if any, is necessary for these limited purposes." *Id*. at 833. Thus, even if we were to give any weight to this subsequent legislative history (and we give little), the House conference report does not support FlightSafety's position.

Ultimately, statutory authority (and legislative history) does not support FlightSafety's position in this appeal. After the Defense Department spent decades weighing competing interests in technical data, Congress entered the fray passing seven statutes in 10 years to try to reach a final resolution regarding the distribution of technical data rights when acquiring products, including commercial items. The Defense Department and Congress flirted with exempting commercial technical data from the statutory requirements in 10 U.S.C. § 2320(a), *redesignated*, 10 U.S.C. § 3771(b) (2021). However, FASA rejected that approach regarding technical data rights (even while exempting many other regulatory requirements from commercial items procurements) and the DFARS (including the standard Commercial Technical Data clause incorporated into the Contract) faithfully reflects statutory directives. Thus, this statutory and regulatory history supports our conclusion regarding the plain language of the Contract's Commercial Technical Data contract clause, which permits the Air Force to manufacture additional items using commercial technical data received under an unrestricted rights license.

V.      *FlightSafety's Commercial Restrictive Legends May Not Contradict the License Rights Given to the Air Force*

Next, we assess whether FlightSafety may include commercial restrictive markings on the data provided to the Air Force with an unrestricted rights license. The parties disagree regarding what standards apply to assess the permissibility of FlightSafety's restrictive markings. The Air Force attempts to import unrelated concepts from patent law (gov't mot. at 24-28). FlightSafety takes the opposite tack, asserting that the Air Force has no authority to invalidate any commercial restrictive marking, even if it contradicts the license rights given the Air Force in the commercial technical data, because the legend has no effect on the license received (app. reply at 3-4, 6-10). We find that the Contract prevents FlightSafety from using any commercial restrictive legend inconsistent with the

license rights the Air Force obtains under the Contract. Based on that standard, we hold that FlightSafety's restrictive legends were not substantially justified.

A. *Commercial Restrictive Legends May Not Contradict the Contract's License Rights*

Unlike the Noncommercial Technical Data clause, the Commercial Technical Data clause does not prescribe any particular language for a protective legend that a contractor or subcontractor must place on commercial technical data. *Boeing*, 983 F.3d at 1330 (noting that "by design, the provisions pertaining to commercial data rights do not have a counterpart" to the required markings under DFARS 252.227-7013(f)). The Noncommercial Technical Data clause includes specific language that a contractor must use in marking data. DFARS 252.227-7013(f) (authorizing "only the following legends" for limited rights, government purpose rights, and special rights licenses in noncommercial technical data). No such prescription encumbers a contractor or subcontractor under the Commercial Technical Data clause. The clause only mentions markings in the negative in a release of liability provision:

> *Release from liability*. The Contractor agrees that the Government, and other persons to whom the Government may have released or disclosed technical data delivered or otherwise furnished under this contract, shall have no liability for any release or disclosure of technical data that are not marked to indicate that such data are licensed data subject to use, modification, reproduction, release, performance, display, or disclosure restrictions.

DFARS 252.227-7015(d). Thus, the Contract's Commercial Technical Data clause does not prescribe any particular language a contractor or subcontractor must use when marking commercial technical data, only that a failure to mark the data extinguishes the government's liability for releasing or disclosing unmarked data.

Also, the Contract affirmatively states a contractor may place a "commercial restrictive legend" on commercial technical data "marked to indicate that such data are subject to use, modification, reproduction, release, performance, display, or disclosure restrictions . . . ." DFARS 252.227-7025(a)(4). This gives a contractor or subcontractor some flexibility to promulgate language that identifies any intellectual property rights in the technical data. *Cf.* 78 Fed. Reg. 32,0233, 30,236-37 (May 22, 2013) (updating DFARS 252.227-7025 and acknowledging that "neither 10 U.S.C. 2320 nor DFARS 252.227-7015 provides the specific form, content, or format for a restrictive legend on technical data related to commercial items (or technical data that is a commercial item)"); *Distribution Statements on Technical Documents*, Department of Defense (DoD) Instruction 5320.24, Encl. 5, ¶ 2.a(2) ("The DFARS guidance concerning restrictive legends on commercial

technologies is more flexible to account for the wide variations in legends and marking that are customarily used in the commercial marketplace.").[20]

The Air Force seeks to import patent law concepts to evaluate FlightSafety's legends. The Air Force asserts that any legend must pass the "broadest reasonable interpretation" test meant to limit the breadth of patent claims during prosecution (gov't mot. at 24-28 (citing *In re Morris*, 127 F.3d 1048, 1053-54 (Fed. Cir. 1997)). To justify the application of patent law, the Air Force points to our decision in *Bell Helicopter Textron*, 85-3 BCA ¶ 18,415 at 92,421-23, which the Air Force claims relied on patent law concepts in interpreting a predecessor to the Noncommercial Technical Data Clause (*see* gov't mot. at 24).

In *Bell Helicopter Textron*, we discussed but ultimately rejected adopting the patent law concept of "actual reduction to practice" in construing the meaning of "developed at private expense" in a data rights clause. *Bell Helicopter Textron*, 85-3 BCA ¶ 18,415 at 92,422-23. We noted that the Armed Services Procurement Regulations (ASPR) originally housed the patent rights and data rights provisions in the same standard clause, but then separated the provisions and the ASPR committee repeatedly rejected adopting the patent law concept. *Id*. at 92,422 ("[T]he ASPR Committee could easily have adopted language such as 'developed at private expense to the point of actual reduction to practice' as the criterion for limited rights, but did not."). Thus, we considered patent law only to the extent it was pertinent to a specific standard contract clause and ultimately concluded that the regulatory development of that standard clause rejected the patent law concept. Here, the Air Force fails to offer any evidence from its regulatory history that the DFARS was intended to use the "broadest reasonable interpretation" patent law concept for commercial restrictive markings.

Moreover, patent rights are distinct from technical data rights. *McDonnell Douglas Corp. v. United States*, 670 F.2d 156, 160 (Ct. Cl. 1982) (stating that "the data rights clause is intended to have no effect on patent rights, whether license or title, granted to the Government . . . ."); 10 U.S.C. § 2320(a)(1) (2020) ("Such regulations may not impair any right of the United States or of any contractor or subcontractor with respect to patents or copyrights or any other right in technical data otherwise established by law."), *redesignated*, 10 U.S.C. § 3771(a)(2)(A) (2021). Thus, we will not use unrelated patent

---

[20] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/523024p.pdf (visited on Nov. 28, 2022). DoD Instruction 5320.24 replaced an earlier regulation – DoD Directive 5320.24 – that is referenced in the Task Order (R4, tab 2 at 10-11). The regulation implements a statute that permits the Secretary of Defense to "withhold from public disclosure any technical data with military or space application in the possession of, or under the control of, the Department of Defense" that may not be legally exported outside the United States. 10 U.S.C. § 130(a).

law concepts to assess commercial restrictive legends placed on technical data absent a showing that the clauses were developed with those patent law concepts in mind.

On the other hand, FlightSafety goes too far when asserting that "the principal purpose of commercial restrictive markings is to identify technical data as proprietary, and not to describe the Government rights in the data" (app. reply at 3). We agree that a commercial restrictive marking primarily notifies users of proprietary or confidential data, but the commercial restrictive legend cannot inhibit the government's license rights.

In particular, the fact that the government cannot dictate the specific language of a commercial restrictive marking does not mean the government cannot question the marking if it inhibits the government's license rights. FlightSafety asserts that nothing in the Commercial Technical Data clause gives the Air Force the ability to challenge the language of the restrictive markings (app. reply at 9), but ignores that the Contract's Validation clause specifically permits the government to challenge restrictive legends. DFARS 252.227-7037(e)(1); *see also* DFARS 227.7103-12(b)(1) ("An unjustified marking is an authorized marking that does not depict accurately restrictions applicable to the Government's use, modification, reproduction, release, performance, display, or disclosure of the marked technical data."); DFARS 227.7103-12(b)(2) ("Contracting officers have the right to review and challenge the validity of unjustified markings."). Thus, the contractor's legends – whatever the wording – may not contradict the license rights the government obtains under the Commercial Technical Data clause.

B. *FlightSafety's Commercial Restrictive Legends Contradict the Contract's Unrestricted License Rights Given to the Air Force*

FlightSafety used or proposed three different commercial protective legends. FlightSafety asserts that its markings "are neither ambiguous nor do they impose restrictions on the Air Force's use or disclosure of the drawings beyond those set forth in the" Commercial Technical Data clause (app. resp. at 32). We assess each protective legend to determine whether and to what extent the legends are inconsistent with the license rights provided to the Air Force. As indicated by the Validation clause, we review the markings and determine whether the Air Force may cancel, correct, ignore, or apply in whole or part the protective legends proposed by FlightSafety. DFARS 252.227-7037(h)(1)(i) & (h)(2)(i) (noting that a restrictive marking can be "cancelled, corrected or ignored" or the contracting officer's decision "not sustained").

The Task Order specifically cites DoD Directive 5320.24, which has been cancelled and replaced with DoD Instruction 5320.24, which both parties rely on in their briefs (R4, tab 2 at 10-11). In particular, DoD Instruction 5230.24 recognizes that "in many cases the contractor is permitted to use any restrictive legend that appropriately provides notice of the contractor's proprietary interests and accurately characterizes the Government's license rights." DoD Instruction 5230.24, Encl. 5, ¶ 2. "A third party-imposed restrictive legend

provides general notice of restrictions on the use or disclosure of the information, but may not completely or accurately specify the entire spectrum of license rights granted to the Government." *Id*. ¶ 3.a. The Validation clause permits the government to seek to invalidate any restrictions that controvert the government's license rights.

We review the two protective legends FlightSafety affixed to the 21 drawings and the alternative legend FlightSafety proposed when the Air Force challenged the validity of these first two legends. FlightSafety affixed the following long-form legend on some of its technical data:

> PROPRIETARY MATERIAL
> Copyright © 2014. All rights reserved.
> FlightSafety International Inc.
> This document, including the information contained herein, is confidential and/or proprietary to FlightSafety International Inc. It shall not be reproduced, distributed, or disclosed to others, except as expressly authorized in writing.

(R4, tabs 10i, 10*l*, 10m, 10n, 10o, 10p, 10q, 10t, 10x, 10y). FlightSafety marked some technical data with the following short-form legend:

> FlightSafety International Proprietary
> Rights Reserved

(R4, tabs 10b, 10c, 10d, 10e, 10j, 10k, 10r, 10s, 10u, 10v, 10w). Additionally, as noted above, FlightSafety proposed a compromise legend when the Air Force challenged the validity of the two legends above:

> FlightSafety Technical Data provided to the US. Government
> with unrestricted rights only pursuant to the requirements in
> CymSTAR Purchase Order PO003174-3 under US Government
> Contract #FA8621-15-D-6257, DO: FA8621-17-F-6255, the
> procedures specified in DFARS 252.227-7015
> and limited by DFARS 227.7103-1.

(R4, tab 7 at 2). The Air Force has objections that cross-over between these markings so we will review the agency's overlapping concerns below.

37

1. *FlightSafety May Not Mark Technical Data with a Legend Identifying the Data as "Proprietary"*

The Air Force objects to the term "proprietary" as ambiguous and contradicting the unrestricted rights license provided by the Commercial Technical Data clause (gov't mot. at 28-30, gov't reply at 15-16). We agree. We find that the various phrasing in each of the legends contradicts the unrestricted rights license, whether "Flight Safety Proprietary," "Proprietary Information," or "This document, including the information contained herein, is confidential and/or proprietary to FlightSafety International Inc."

"Restrictive legends alert all government officials—even those unfamiliar with the data rights of the contractor—that data is considered proprietary and is inappropriate for dissemination." *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 381 (2005), *aff'd*, 469 F.3d 1369 (Fed. Cir. 2006); *E.M. Scott & Assocs.*, ASBCA No. 45869, 94-3 BCA ¶ 27,059 at 134,838 ("Setting forth a restrictive legend, such as that prescribed by FAR 52.215-12, on data submitted alerts the Government that the data is considered proprietary by the submitter and deemed inappropriate for public dissemination."); *Gen. Atronics Corp.*, ASBCA No. 49196, 02-2 BCA ¶ 31,798 at 157,067 (concluding that contractor failed to mark software "with a restrictive legend" and thus did not protect it). The government and support contractors receiving the data have an obligation to "safeguard the confidentiality of the data in accordance with the terms of the restrictive legend" placed on the data "and not to use it unless permitted to do so by the terms of the legend itself." *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1360 (Fed. Cir. 1983); DFARS 252.227-7025.

Here, the "proprietary" restriction impermissibly contradicts the Air Force's license rights. FlightSafety's proprietary restrictive legend conveys that the Air Force may not disseminate the data received and any authorized users would have to treat the data as subject to confidential and trade secret protection. However, the unrestricted rights license in the Commercial Technical Data clause gives the Air Force the "unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so." DFARS 252.227-7015(b)(1). Thus, we conclude that FlightSafety may not mark the technical data at issue here with a "proprietary" legend because it contradicts the unrestricted rights license obtained by the Air Force under the Commercial Technical Data clause.

2. *FlightSafety May Not Include a Copyright Notice in its Protective Legends*

The Air Force also objects to FlightSafety's use of a copyright notice, which it variously labeled as "Copyright © 2014. All rights reserved." in the long-form legend or "rights reserved" in the short-form legend (which we understand and treat as a copyright notice). The Air Force asserts that the copyright notices "encumber the Government's unrestricted rights" to the OMIT data (gov't mot. at 30). We agree.

A copyright owner "has the exclusive rights to do and to authorize" reproduction, preparation of derivative works (*i.e.* modification), distribution (*i.e.* release), performance, or display of copyrighted work. 17 U.S.C. § 106(1)-(5). "[N]otice of the copyright on the document is permissive, not mandatory." *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1370 n.6 (Fed. Cir. 2007). A copyright holder may affix a copyright notice to its technical data using "the symbol © (the letter C in a circle), or the word 'Copyright,'" "the year of first publication of the work," and "the name of the owner of copyright in the work . . . ." 17 U.S.C. § 401(b)(1)-(3). And, it is not uncommon for copyright holders to also use phrases such as "All Rights Reserved" as part of a copyright notice accompanying technical data. *See, e.g.*, *Ervin & Assocs., Inc. v. United States*, 59 Fed. Cl. 267, 284 (2004) (discussing notebook provided to the government that included the legend, "ALL RIGHTS RESERVED, Copyright 1994, 1995, 1996 By Ervin and Associates, Incorporated."), *aff'd*, 120 F. App'x 353 (Fed. Cir. 2005).

The unrestricted rights license FlightSafety has provided under the Commercial Technical Data clause authorizes the Air Force to "modify, reproduce, release, perform, [or] display" the applicable technical data. DFARS 252.227-7015(b)(1). In other words, the Commercial Technical Data clause includes a copyright license to the government for the applicable technical data. Ralph C. Nash, Jr. & Leonard Rawicz, *Intellectual Property in Government Contracts* 628 (6th ed. 2008) ("There is no specific statement in this DFARS clause that this provision is a copyright license, but the fact that it deals with the right to reproduce, modify, perform and display establishes that it is a copyright license, at least in part.").

In *Boeing*, the government insisted that "a notice of copyright does not actually restrict the government's rights because the government automatically obtains a copyright license that is coextensive with its technical data rights license." *Boeing*, 983 F.3d at 1328. However, the Federal Circuit rejected that argument, concluding that "a notice of copyright is a legend that restricts the government's rights" because the government remained liable for copyright infringement if it acted outside the license rights. *Id*. Thus, because the Federal Circuit concluded that a copyright notice imposes restrictions on the government's license rights, we hold that FlightSafety may not include a copyright notice applicable to the Air Force.

3. *FlightSafety Cannot Require the Air Force to Obtain Written Permission for Use and Release of the Data Subject to the Unrestricted Rights License*

The Air Force objects to the last sentence of the long-form protective legend, which states: "It shall not be reproduced, distributed, or disclosed to others, except as expressly authorized in writing." Specifically, the Air Force asserts that the last sentence in the long-form legend conflicts with the unrestricted rights license granted to the Air Force by the Commercial Technical Data clause (gov't mot. at 30). We agree.

39

The unrestricted rights license in paragraph (b)(1) of the Commercial Technical Data clause does not require the government to obtain written permission to reproduce, distribute, or disclose that data to others. DFARS 252.227-7015(b)(1). To the contrary, the unrestricted rights license specifically gives the Air Force the right to "reproduce . . . or disclose technical data, and to permit others to do so." *Id*. The Commercial Technical Data clause only requires the Air Force to obtain FlightSafety's prior written consent to release data subject to the license in paragraph (b)(2), not the unrestricted rights license in paragraph (b)(1). DFARS 252.227-7015(b)(2)(ii) (stating the "Government shall not . . . [r]elease, perform, display, disclose, or authorize use of the technical data outside the Government without the Contractor's written permission unless a release, disclosure, or permitted use is necessary for emergency repair or overhaul of the commercial items furnished under this contract, or for performance of work by covered Government support contractors"). The long-form legend's requirement that the Air Force obtain FlightSafety's prior written consent in these circumstances contradicts the license granted. Thus, as to the Air Force, FlightSafety's legend cannot stand.

Given this shortcoming in the long-form legend, FlightSafety asserts that the long-form restrictive legend primarily serves to place "non-governmental third-parties" on notice of FlightSafety's proprietary interest in the data (app. resp. at 32). While the Air Force demurs on this argument, we agree that a legend would be appropriate for third parties and consistent with the requirements of the Contract. *Boeing*, 983 F.3d at 1327-33 (concluding that Noncommercial Technical Data clause did not prevent contractor from restricting use and release of data by non-government third-parties). FlightSafety retains its ownership rights in the data even though the Air Force obtains an unrestricted rights license in the data. *Boeing*, 983 F.3d at 1332 ("Neither party disputes that, when a contractor delivers technical data to the government, the contractor maintains ownership of the data and at least some rights in the data."). The Contract requires third-party support contractors that receive the data to obtain written permission from the licensor before further releasing the data. DFARS 252.227-7025(b)(4)(i) ("The [Government support] Contractor shall not, without the express written permission of the party whose name appears in the legend, use the technical data to manufacture additional quantities of the commercial items, or release or disclose such data to any unauthorized person.").

Notwithstanding our agreement that FlightSafety could place restrictions on third parties, FlightSafety has failed to do so here. In *Boeing*, the contractor's legend explicitly stated that it was a "non-US Government notice" or warned that "Non-U.S. Government recipients may use and disclose only as authorized by Boeing or the U.S. Government." *Boeing*, 983 F.3d at 1325. FlightSafety's restrictive marking does not appropriately circumscribe the restrictions to third parties. Thus, as written, the restrictive legend contradicts the Air Force's license rights in the Contract and is not permissible.

### 4. *FlightSafety's Proposed Alternative Marking Contradicts the License*

The Air Force objects to the alternative marking that limits the government's rights pursuant to "CymSTAR Purchase Order PO003174-3 under US Government Contract #FA8621-15-D-6257, DO: FA8621-17-F-6255, the procedures specified in DFARS 252.227-7015 and limited by DFARS 227.7103-1." First, the alternative legend requires that the Air Force follow the "procedures specified in DFARS 252.227-7015 and limited by DFARS 227.7103-1." The Air Force takes exception to the requirement to follow the "procedures" in DFARS 252.227-7015 – the Commercial Technical Data clause – because the agency asserts that the procedures in the clause only apply to some types of licensed data (gov't mot. at 31). For example, the government does not have to follow any procedure in exercising its use, disclosure, or rights under the unrestricted rights license. DFARS 252.227-7015(b)(1). And the Air Force correctly notes that DFARS 227.7103-1 – the DFARS' "Noncommercial items or processes" policy – does not specifically apply to commercial items.

Second, the alternative marking limits the government's rights to the terms of the Purchase Order between CymSTAR and FlightSafety. However, FlightSafety has failed to point to any relevant document (and we have found none) binding the Air Force to these requirements of the subcontract between CymSTAR and FlightSafety, except the Commercial Technical Data clause that the Air Force required CymSTAR to flow down to FlightSafety. DFARS 252.227-7015(e)(2). For example, there is no separate end user license agreement or special license agreement applicable to the Air Force regarding this technical data. *Cf., e.g. 4DD Holdings, LLC v. United States*, 159 Fed. Cl. 337 (2022) (discussing a contractor's software end user license agreement that bound the government and for which the subcontractor sued for copyright infringement and breach of contract).

Thus, this restriction in the alternative legend may not be used because it conflicts with the Commercial Technical Data clause's unrestricted rights license.

### C. *Neither Party Seeks Costs*

The Validation clause permits the government to collect fees if the subcontractor's restrictive markings are found "not to be substantially justified." DFARS 252.227-7037(h)(1)(ii). The Validation clause permits the contractor or subcontractor to collect fees if the government's challenge was not made in "good faith." DFARS 252.227-7037(h)(2)(ii). However, as part of their partial settlement agreement, each party has agreed to bear its own costs and neither party seeks costs under the Validation clause. Therefore, each party shall bear its own costs.

## CONCLUSION

For the reasons discussed above, (1) we deny FlightSafety's appeal on Count I because contractual and statutory provisions permit the Air Force to challenge the proprietary restrictions of the type of commercial technical data at issue here, despite having been exclusively developed at private expense; (2) we deny FlightSafety's appeal on Count II because we find that FlightSafety's commercial restrictive markings contradict the unrestricted rights license in the Commercial Technical Data clause; and (3) we dismiss Count III per the settlement agreement entered by the parties. Neither party is awarded costs.

Dated: November 29, 2022

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62659, Appeal of FlightSafety International, Inc., rendered in conformance with the Board's Charter.

Dated:  November 29, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals